No. 02-341

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 352

POMPEYS PILLAR HISTORICAL ASSOCIATION,

      Petitioner and Appellant,

  v.

MONTANA DEPARTMENT OF ENVIRONMENTAL
QUALITY, and UNITED HARVEST, LLC,

      Respondents and Respondents.

APPEAL FROM:    District Court of the First Judicial District,
In and for the County of Lewis and Clark,
The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

      Gerald J. Neely, Attorney at Law, Billings, Montana

      For Respondents:

      Norman J. Mullen, Special Assistant Attorney General, Helena, Montana
(Department of Environmental Quality)

      J. Daniel Hoven, Sara B. Stanton, Browning, Kaleczyc, Berry & Hoven, P.C.,
Helena, Montana (United Harvest, LLC)

      Submitted on Briefs:  September 19, 2002

      Decided:  December 30, 2002

Filed:

_____
Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1    In the summer of 2000, Respondent United Harvest sought to construct a high speed grain loading terminal east of Billings, Montana, near Pompeys Pillar National Monument.  United Harvest obtained an air quality permit from Respondent Department of Environmental Quality ("DEQ") to build the facility. Appellant Pompeys Pillar Historical Association ("Association") commenced administrative review proceedings in an effort to overturn the issuance of the permit.  Ultimately, the Board of Environmental Review ("Board") affirmed DEQ's issuance of the permit.

¶2    The Association subsequently petitioned the First Judicial District Court, Lewis and Clark County, to review the Board's decision.  The District Court dismissed the Association's petition for lack of subject matter jurisdiction.  The Association appeals from the District Court's order of dismissal.  We affirm.

¶3    The sole issue on appeal is whether the District Court erred when it dismissed the Association's petition for review for lack of subject matter jurisdiction.

## BACKGROUND

¶4    Pompeys Pillar is a national historic monument located approximately twenty-eight miles east of Billings, Montana.  The Association is a non-profit organization which provides educational and administrative services to support the monument's preservation.

¶5    Several years ago, United Harvest purchased land adjacent to Pompeys Pillar.  United Harvest sought to construct a high speed grain loading terminal, consisting of silos, grain conveyors, grain

2

elevators, truck scales, and a railroad loop track on this land. United Harvest intended to build this facility approximately one half to three-quarters of a mile from Pompeys Pillar.

¶6     Toward this end, United Harvest filed an application with DEQ for an air quality permit in August of 2000. In evaluating whether to issue the permit, DEQ conducted an initial and supplemental environmental assessment. The assessment evaluated the proposed facility's impact on the surrounding environment. DEQ concluded: (1) that the facility would not detrimentally impact the surrounding environment, more specifically the local air quality; and (2) that it was not necessary to issue an environmental impact statement. Therefore, on September 29, 2000, DEQ issued an air quality permit to United Harvest.

¶7     In mid October 2000, the Association appealed the issuance of the permit to an administrative law judge. The appeal sought to overturn the issuance of the permit on the grounds that DEQ erred in its preparation of the environmental assessment. DEQ and United Harvest filed a motion to dismiss the administrative contested case hearing. The motion argued that the administrative law judge lacked jurisdiction to entertain the challenge and, instead, insisted that the Association should file the appeal in the appropriate district court. The administrative law judge denied the motion.

¶8     On June 28, 2001, the administrative law judge concluded that DEQ "acted arbitrarily and capriciously . . . by issuing a permit without conducting an [environmental impact statement]."

3

Therefore, the judge recommended that the matter be remanded to DEQ for it to conduct the necessary evaluation. Notably, the findings did not address issues of air quality, but, instead, addressed the adequacy of the environmental assessment.

¶9 On July 12, 2001, United Harvest and DEQ filed exceptions to the administrative law judge's findings with the Board of Environmental Review. On August 9, 2001, the Board declined to implement the administrative law judge's recommendation and, instead, ordered DEQ to prepare a supplemental environmental assessment "addressing noise impacts . . . and the historic and cultural significance of the site." On October 24, 2001, following DEQ's submission of a supplemental environmental assessment, the Board concluded that DEQ did not act arbitrarily, capriciously, or unlawfully in conducting the relevant evaluations. Therefore, the Board affirmed DEQ's decision to issue the air quality permit.

¶10 On November 26, 2001, the Association petitioned the District Court to review the Board's decision. On February 14, 2002, DEQ moved the District Court to dismiss the Association's petition on the grounds that the District Court lacked subject matter jurisdiction over the case. Paralleling the argument it presented to the administrative law judge, DEQ maintained that the challenge presented to the administrative arbiters did not contain any air quality issues. DEQ contended that the administrative proceedings addressed environmental assessment issues only, which fall within the province of the Montana Environmental Policy Act ("MEPA"). According to DEQ, MEPA does not provide for administrative review

4

of challenges to MEPA compliance. DEQ argued that challenges to MEPA compliance must be brought in district court. Therefore, as the administrative law judge and Board did not have jurisdiction to preside over the Association's appeal, DEQ asserted that the District Court lacked jurisdiction to review the administrative proceedings.

¶11 Following a hearing on the matter, the District Court issued its Decision and Order on April 18, 2002. Pursuant to the rationale offered by DEQ, the District Court dismissed the Association's petition for review for lack of subject matter jurisdiction. On May 28, 2002, the Association filed a notice of appeal from the District Court's order of dismissal.

STANDARD OF REVIEW

¶12 A district court's determination that it lacks jurisdiction is a conclusion of law. *Threlkeld v. Colorado*, 2000 MT 369, ¶ 7, 303 Mont. 432, ¶ 7, 16 P.3d 359, ¶ 7. We review a district court's conclusions of law to determine whether the court's interpretation of the law is correct. *Carbon County v. Union Reserve Coal Co., Inc.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

DISCUSSION

¶13 Did the District Court err when it dismissed the Association's petition for review for lack of subject matter jurisdiction?

¶14 The Association maintains that § 75-2-211, MCA, authorizes an adversely affected party to appeal the approval or denial of an air quality permit to the Board of Environmental Review. Since the Association contends that it was

5

entitled to an administrative contested case proceeding, it argues that it was subsequently entitled to judicial review of the administrative decision, pursuant to § 2-4-702, MCA.

¶15 According to the Montana Administrative Procedure Act ("MAPA"), an administrative agency must afford all parties a trial-type hearing in a "contested case." *See* §§ 2-4-601, -612, MCA. MAPA provides that a "contested case" is "a proceeding before an agency in which a determination of legal rights, duties, or privileges of a party is required by law to be made after an opportunity for hearing." Section 2-4-102(4), MCA. District courts maintain jurisdiction to review such contested case proceedings. *See* §§ 2-4-701-702, MCA. Therefore, for purposes of this case, the critical inquiry is whether the Association was entitled by law to raise its specific challenge to the issuance of the air quality permit in a contested case proceeding.

¶16 The Clean Air Act of Montana, found at Title 75, Chapter 2, Parts 1-4, MCA, governs the issuance of air quality permits. Section 75-2-111(2), MCA, provides that "[t]he board [of environmental review] shall . . . hold hearings relating to any aspect of or matter in the administration of this chapter at a place designated by the board." "This chapter," referenced in § 75-2-111(2), MCA, refers to the Clean Air Act of Montana and the Asbestos Control Act, not MEPA. Further, § 75-2-211(10), MCA, provides:

> When [DEQ] approves or denies the application for a permit under this section, a person who is jointly or severally adversely affected by [DEQ's] decision may request a hearing before the board [of environmental review]. . . . The contested case provisions of the

6

> Montana Administrative Procedure Act, Title 2, chapter 4, part 6, apply to a hearing before the board [of environmental review] under this subsection.

Clearly, had the Association challenged DEQ's decision in regard to issues of air quality, it would have been entitled to pursue contested case proceedings. However, it did not do so.

¶17 The Legislature enacted MEPA to prevent or eliminate environmental damage as well as protect the right to use and enjoy private property free from undue governmental regulation. *See* § 75-1-102, MCA. MEPA requires that state agencies conduct environmental reviews when state action will significantly affect the quality of the human environment. Rule 17.4.607, ARM. "Environmental review" means any environmental assessment, environmental impact statement, or other written analysis conducted by a state agency to examine the impact of a proposed action on the quality of the human and physical environment. Section 75-1-220(4), MCA. State action encompasses a state agency's issuance of a lease, permit, license, certificate, or other entitlement for use or permission to act. Rule 17.4.603(1), ARM. Therefore, United Harvest's application for an air quality permit implicated state action and, thus, required DEQ to conduct an environmental review prior to its issuance.

¶18 Notably, the environmental review process is governed by MEPA and its corresponding administrative rules, not the Clean Air Act of Montana. As stated in the District Court's order of dismissal, "The environmental assessment . . ., although conducted contemporaneously with the air quality review for the air quality

7

permit, was not part of the air quality permit process itself . . . ." As for the requisite environmental review process, Rule 17.4.607, ARM, provides:

> In order to determine the level of environmental review for each proposed action that is necessary to comply with 75-1-201, MCA, the agency shall apply the following criteria:
>
> (1) The agency shall prepare an [environmental impact statement] as follows:
>
> (a) whenever an [environmental assessment] indicates that an [environmental impact statement] is necessary; or
>
> (b) whenever, based on the criteria in ARM 17.4.608, the proposed action is a major action of state government significantly affecting the quality of the human environment.

Therefore, the environmental assessment acts, in part, as an initial evaluation to determine whether an agency must prepare an environmental impact statement. Rule 17.4.607(2)(c), ARM.

¶19    Here, DEQ conducted an environmental assessment in contemplation of the proposed facility's impact on the surrounding environment. Upon completion of the environmental assessment, DEQ deemed it unnecessary to issue an environmental impact statement. It is the issues surrounding the environmental assessment that the Association sought to challenge through contested case proceedings, i.e., the sufficiency of the environmental assessment and the decision not to issue an environmental impact statement. In fact, the Association requested the following relief from the District Court: "The Court is requested to remand the case under instructions to order [DEQ] to conduct an Environmental Impact Statement concerning the planned project of United Harvest . . . ."

8

Further, on appeal, the Association admits that it sought to challenge primarily "the sufficiency of [the] Environmental Assessment" throughout the administrative proceedings. Therefore, as the environmental review process is governed by MEPA, we must look to the appellate procedures contained therein to determine whether the Association was entitled to administrative review of the issues presented.

¶20    Section 75-1-201(3), MCA (1999), provides:

> (a)  In any action challenging or seeking review of an agency's decision that . . . [an environmental impact statement] is not required or that the statement is inadequate, the burden of proof is on the person challenging the decision.  Except as provided in subsection (3)(b), in a challenge to the adequacy of a statement, a *court* may not consider any issue or evidence that was not first presented to the agency for the agency's consideration prior to the agency's decision.  A *court* may not set aside the agency's decision unless it finds that there is clear and convincing evidence that the decision was arbitrary or capricious or not in compliance with the law.

> (b) When new, material, and significant evidence is presented to the *district court* that had not previously been presented to the agency for its consideration, the *district court* shall remand the new evidence back to the agency for the agency's consideration and an opportunity to modify its findings of fact and administrative decision before the *district court* considers the evidence within the administrative record under review. . . . The *district court* shall review the agency's findings and decision to determine whether they are supported by substantial, credible evidence within the administrative record under review.  [Emphasis added.]

Ironically, the Legislature amended this provision in 2001 to add, in part, the following language: "A challenge to an agency action under this part may only be brought against a final agency action and may only be brought in district court or in federal court, whichever is appropriate."  Section 75-1-201(6)(a), MCA.  One of

9

the representatives indicated that this provision was added to clarify the review process. Nevertheless, both parties agree that the 1999 version of the statute applies to the case at bar.

¶21 Section 75-1-201(3), MCA (1999), clearly envisions challenges to MEPA compliance before a "court" or "district court." MEPA does not contain a corollary to § 75-2-211(10), MCA, the contested case provision in the Clean Air Act of Montana. Had the Association simply challenged air quality issues, it would have been entitled to administrative proceedings. However, the Association admits that its challenge contemplated only those issues which pertained to the environmental assessment. Since MEPA governs environmental review, and since MEPA requires a party to bring a compliance challenge before a "court" or "district court," the administrative law judge and Board did not have jurisdiction to hear the Association's challenge. As such, the District Court did not have jurisdiction to review the Board's determination. Consequently, the District Court did not err when it dismissed the Association's petition for review for lack of subject matter jurisdiction.

¶22 Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JIM RICE

10

Justice Terry N. Trieweiler concurs.

¶23    Based on the arguments presented by the parties, I concur with the majority Opinion.  However, in doing so, I do not express any opinion about the adequacy of the procedural due process provided for in the Montana Environmental Policy Act for challenging decisions made by the Department of Environmental Quality.  Furthermore, I assume that because there was no time limit within which to commence a direct action pursuant to § 75-1-201(3), MCA (1999), that a direct action in district court can still be filed by Pompeys Pillar Historical Association challenging the adequacy of the environmental assessment prepared by the DEQ and that the merits of the Association's claims, as well as the adequacy of the due process afforded, can ultimately be resolved in that manner.

¶24    For these reasons, I concur with the majority Opinion.


                                    /S/ TERRY N. TRIEWEILER

11